```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
SEAN WILSON,                                                :
                                                            :
                              Plaintiff,                    :   **MEMORANDUM DECISION**
                                                            :   **AND ORDER**
                 - against -                                :
                                                            :   12-cv-06024 (BMC)
PAUL G. HANRAHAN and NEW YORK CITY                          :
DEPARTMENT OF EDUCATION,                                    :
                                                            :
                              Defendants.                   :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

    Plaintiff Sean Wilson brought this action for racial discrimination and related claims. To summarize, Wilson claimed that defendant Paul G. Hanrahan, his supervisor and/or employer, discriminated against him and terminated him after Wilson complained to various administrative bodies about Hanrahan. Hanrahan, in turn, responded that he terminated Wilson for playing basketball when he was supposed to be working, as well as Wilson's poor performance and disciplinary record.

    After a four-day trial, the jury returned a verdict in favor of Hanrahan.[1] Before me is Wilson's motion for a new trial and for consolidation of defendants. For the reasons stated below, Wilson's motion is denied.

---

[1] Wilson also brought claims against co-defendant New York City Department of Education, but as discussed below, these claims were severed from the claims against Hanrahan, and dismissed when the jury found in favor of Hanrahan.

# SUMMARY OF TRIAL

This is a partial summary of events that transpired at trial as relevant to plaintiff's motion.

## I. Jury Selection

Magistrate Judge Lois Bloom conducted jury selection. Hanrahan's counsel exercised pre-emptory strikes on three individuals, including two African American women: Prospective Jurors 2 and 9. Wilson's counsel claimed that Hanrahan's counsel was exercising his strikes in a racially discriminatory manner and challenged the strikes under Batson v. Kentucky, 476 U.S. 79 (1985).

In response, Hanrahan's counsel stated that he struck Prospective Juror 2 because she watches NCIS, which, he said, may set unrealistic expectations for the use of technology and evidence at trial. Hanrahan's counsel also explained that he struck Prospective Juror 9 because her daughter's involvement with the Innocence Project may relate to criminal defendants who were wrongfully convicted because of discrimination.

Judge Bloom then noted that Prospective Juror 9 works for the New York City Department of Education, which "would be a separate basis" to strike her. After Judge Bloom made this statement, Hanrahan's counsel added that "No. 2's mother [who lives with Prospective Juror 2] also works as a custodian, so a similar position to the Plaintiff and [Prospective Juror 2] may have a predisposition to side with a like-employed individual." Judge Bloom found that these explanations were race neutral and denied Wilson's counsel's challenge to defense counsel's use of preemptory strikes.

At no time until the instant motion did Wilson's counsel call the Batson challenge to my attention.

## II. Wilson's Testimony

The primary witnesses at trial were Wilson and Hanrahan, a custodian engineer who employed Wilson as a custodial assistant at the Franklin K. Lane School.[2] Wilson testified that he had worked at this school from 2001-2011 and conceded that he played basketball while at work.

Hanrahan's counsel asked Wilson whether he had been previously supervised by Hanrahan's predecessors, custodian engineers Gerard Estelle or James Durack, from 2008-2009. Wilson did not recall being supervised by – and denied receiving documents criticizing his performance from – Estelle or Durack. Wilson's counsel objected to Hanrahan's counsel questioning Wilson about these documents because Wilson claimed he never received them, but the Court permitted Hanrahan's counsel to try to refresh Wilson's recollection about the events described in the letters and the prior criticisms by Estelle and Durack.

In 2009, Hanrahan became Wilson's supervisor and assigned Wilson a larger workload, including cleaning the bathrooms and staircases. Wilson described these cleaning tasks as "the worst job to do … ." Four months later, Wilson verbally complained to his union representative that Hanrahan had terminated African American and Hispanic employees and had also denied Wilson training on using a high-pressure boiler.

Wilson testified that on April 15, 2010, Hanrahan asked him, "Hey, how's your jump shot?" and that Wilson replied, "Oh, I don't do that. I have asthma." In response, according to Wilson, Hanrahan stated, "You're full of shit and you know how your people like to play

---

[2] Under New York City's peculiar double-tiered janitor arrangement, the Department of Education hires "custodial engineers," who appear to be supervisors, and who then hire their own "custodial assistants", who they presumably pay out of funds provided to them by the DOE. See generally Najjar v. Mirecki, No. 11-cv-5138, 2013 WL 3306777, at *1 (S.D.N.Y. July 2, 2013).

basketball. Me and you haven't gone face-to-face yet, you just cost yourself your job." A day later, Wilson slid a letter under the principal's door to complain about this encounter with Hanrahan.

A day after that, two individuals took down posters in Wilson's slop sink area and knocked Wilson into the sink. Wilson informed Hanrahan about the incident. On April 17 or 21, 2010, Hanrahan gave Wilson a letter of termination. But on April 28, 2010, Wilson and Hanrahan entered into an agreement reinstating Wilson after a one-day suspension.

At some point in 2010, Wilson complained to the Equal Employment Opportunity Commission. After Wilson filed this complaint, his workload increased and included an assignment to an area that needed to be painted and was poorly ventilated, even though Wilson had asthma. In November 2010, Wilson also filed an internal complaint with the Equal Employment Office alleging, among other things, that Wilson's increased workload was a form of retaliation. The Equal Employment Office found Wilson's claims unsubstantiated.

On November 15, 2010, Wilson filed a complaint with the New York State Division of Human Rights alleging, among other things, that Wilson was denied a handyman position and also denied training.

Two days later, Wilson was with a former school custodian when Hanrahan approached them and stated, "What are you doing here? What are you, his concierge?" Hanrahan looked like he wanted to fight but other individuals intervened to break up the fight. Wilson was not allowed into the school building the next day.

Wilson attended a grievance hearing involving Hanrahan and labor union representatives. At the hearing, Hanrahan described Wilson as a "Section 8 guy." Wilson was reinstated at work

after the hearing. However, when he came back to work, someone posted a swastika on Wilson's locker, and Wilson informed Hanrahan.

In November 2010, Wilson had an asthma attack at work after inhaling fumes. Hanrahan's secretary called an ambulance and Wilson was hospitalized. A video from before the incident showed an individual walking into Wilson's slop sink area with chemicals in a container and then leaving the area with an empty container around this time as well. Wilson informed Hanrahan and the police of this, among others, but Hanrahan stated that Wilson didn't "have proof" and "did that to" himself. The next month, Wilson complained to the New York State Division of Human Rights about, among other things, his asthma attack and the incident in which Wilson was not allowed into the school building.

Wilson chose to keep a personal logbook of events occurring at work. He testified that at some point, someone had written a racial slur in his logbook. Wilson informed Hanrahan, who stated that Wilson "knows where [he] can take" the logbook. Wilson then filled out a complaint form and informed his union. In addition, someone drew a target on Wilson's timecard from February 3, 2011, and Wilson informed Hanrahan.

In June 2011, Wilson was terminated for playing basketball at work. Someone made a video of four individuals playing basketball at the school where Wilson worked, although Wilson claimed it was difficult to identify the individuals in the video. Wilson's counsel objected to introducing the video into evidence, and – although Hanrahan's lawyer showed the video to Wilson – the video was not received into evidence.

### III. Hanrahan's Testimony

Hanrahan testified that in 2009, he became Wilson's supervisor and, at that time, terminated multiple employees to save money. Hanrahan explained that he had not provided

5

formal training to his employees, but some employees had provided informal training to each other. Hanrahan further testified that by April 2010, two principals had complained about issues with the bathrooms and classroom garbage cans at the school where Wilson worked.

A school safety officer informed Hanrahan that employees who reported to him were playing basketball at work. Hanrahan confirmed that he asked Wilson how his jump shot is, but further testified that Wilson responded that he couldn't play basketball because he had asthma. Hanrahan told Wilson that he was "full of shit." However, Hanrahan admitted to having testified at his deposition that he never used profanity at the school.

Hanrahan also learned that Wilson had given a letter to the principal complaining that Hanrahan made Wilson do too much work. Hanrahan testified that Wilson should have complained to Hanrahan instead.

Hanrahan testified that the school chancellor had circulated a memorandum directing removal of offensive pictures from school property in light of complaints in other schools about pictures of scantily clad women at a cleaner's slop sink. Hanrahan posted a note directing staff to remove any such pictures. Approximately a week later, Wilson had failed to remove the pictures at his slop sink, so another individual directed Wilson to remove the pictures. An altercation occurred when individuals later removed the pictures that Wilson had still not removed.

In November 2010, Hanrahan witnessed Wilson in the school with a former custodian who was not supposed to be in the building. Hanrahan was upset because Wilson appeared to have let the former custodian back into the building. Hanrahan testified that Wilson lunged at him but other individuals stopped Wilson before he could land a punch.

Hanrahan also confirmed that Wilson had an asthma attack when entering the slop sink area of a colleague after Wilson stored his materials in this colleague's slop sink area. Hanrahan further confirmed that someone had written a racial slur in a logbook that Wilson maintained, but noted that Wilson was not authorized or requested to keep such a logbook. Multiple individuals advised Hanrahan that it was Wilson who had written this racial slur in his own logbook.

In June 2011, Hanrahan terminated Wilson. Someone made a video of four individuals, including Wilson, playing basketball at work, and Hanrahan called the Inspector General's Office and asked it to investigate. This IG obtained more video from the school video system showing these individuals entering and leaving the gym and recommended termination of these individuals for cause. Hanrahan terminated all four of these individuals, including Wilson.

IV.   Verdict

The jury returned a unanimous verdict in favor of Hanrahan.

## DISCUSSION

I.   **Motion for a New Trial**

Federal Rule of Civil Procedure 59 allows a party to move for a new trial, but a "motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 623 (2d Cir. 2001) (internal quotation mark omitted). However, Federal Rule of Civil Procedure 61 provides that courts must disregard errors in admitting or excluding evidence "that do not affect any party's substantial rights." "Whether an evidentiary error implicates a substantial right depends on the likelihood that the error affected the outcome of the case." Tesser v. Board of Educ. of City School Dist. of City of

7

New York, 370 F.3d 314, 319 (2d Cir. 2004) (internal quotation marks omitted). Here, the Court finds that there was no error at trial, let alone any error that affected a party's substantial rights.

### A. The <u>Batson</u> Challenge

<u>Batson v. Kentucky</u>, 476 U.S. 79 (1985), provides a framework for challenging discrimination in jury selection. Under this framework, the challenging party must make "a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race." <u>Overton v. Newton</u>, 295 F.3d 270, 276 (2d Cir. 2002). The challenging party may make such a *prima facie* case by "showing a pattern of challenges against minority prospective jurors." <u>Id.</u> Once the challenging party makes such a *prima facie* showing, "the trial court must require the non-moving party to proffer a race-neutral explanation for striking the potential juror." <u>Id.</u>

"[W]hen the non-moving party has proffered a race-neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving that the strike had been motivated by purposeful discrimination." <u>Id.</u> "Unless a discriminatory intent is inherent in the … explanation, the reason offered will be deemed race neutral." <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995) (internal quotation mark omitted).

When a magistrate judge performs jury selection, "de novo review by the district judge of the magistrate's jury selection decisions must be available if requested by one of the parties." <u>U.S. v. Taylor</u>, 92 F.3d 1313, 1326 (2d Cir. 1996). Parties must "appeal [a magistrate judge's] adverse *Batson* rulings to the district judge as promptly as may be done." <u>United States v. Thomas</u>, 303 F.3d 138, 143 (2d Cir. 2002). Although the law on this issue was not settled before <u>Thomas</u>, the Second Circuit in <u>Thomas</u> – 17 years ago – cautioned that "[i]n the future, delay in advising the district judge of a *Batson* issue promptly, and in any event before the jury is sworn,

8

may … result in waiver." Id. at 143-44.  A party waives the right to appeal a magistrate judge's adverse Batson ruling "[i]f the party waits until moments before empanelment to raise the issue, fails to present a proper record of the proceedings before the magistrate judge, and fails to take steps to ensure the continued availability of the juror whose exclusion is at issue … ."  United States v. 777 Greene Ave., 445 F. App'x 392, 394 (2d Cir. 2011).

Here, Wilson's counsel raised a Batson challenge to the Magistrate Judge, who rejected the challenge.  Counsel had the opportunity to appeal the denial of the Batson challenge to me before I empaneled the jury but failed to do so.  Instead, she raised the Batson challenge to me for the first time in the instant post-trial motion.  She has not even attempted to excuse the failure to appeal the denial earlier.

An attorney cannot hold an adverse Magistrate Judge ruling on an unsuccessful Batson challenge in her back pocket and then spring it on the Court if she is not satisfied with the jury's verdict.  Wilson has waived his right to appeal the denial of his Batson challenge.

In any event, even if Wilson's counsel had brought the Batson challenge before me in a timely manner, I would have rejected it on *de novo* review.  Judge Bloom's ruling was fully supported by the record and would have been affirmed.

Defense counsel explained that he struck Prospective Juror 2 because she watched the television show NCIS and may have developed unrealistic expectations about the use of technology and evidence at trial.  A concern that regularly viewing police procedural television shows may lead a prospective juror to have unrealistic expectations for the presentation of evidence is a "credible race-neutral ground[] for … exercise of a peremptory challenge."  United States v. Farhane, 634 F.3d 127, 157-58 (2d Cir. 2011).  Defense counsel further stated that Prospective Juror 2's mother had worked, like Wilson, as a custodian, which might create a bias

9

in Wilson's favor.  Prospective Juror 2 also explained that she lives with her mother, which increases the possibility that her mother's profession would have biased her in Wilson's favor.

Defense counsel also explained that he struck Prospective Juror 9 because her daughter was involved with the Innocence Project and may have worked with defendants who were wrongfully convicted because of discrimination.  Judge Bloom appropriately found no discriminatory intent for the strikes.

The argument of Wilson's counsel to the contrary mischaracterizes the record.  Counsel argues that Judge Bloom raised *sua sponte* Prospective Juror 2's mother's occupation as a custodian.  That's wrong.  Judge Bloom noted Prospective Juror 9's employer was the Department of Education.  It was defense counsel – not Judge Bloom – who noted that the mother of a different juror – Prospective Juror 2 – had worked as a custodian.  Further, as noted above, defense counsel provided additional reasons for striking both jurors, and Wilson's counsel did not show discriminatory intent in either of those reasons.

### B.  Hanrahan's Credibility

A "court should rarely disturb a jury's evaluation of a witness's credibility."  DLC Mgmt Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998).  Although a judge may set aside a jury verdict to prevent a "miscarriage of justice," where "the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."  United States v. Landau, 155 F.3d 93, 105 (2d Cir. 1998) (internal quotation mark omitted).

Wilson's counsel argues that because she impeached Hanrahan's credibility when he testified, the jury's verdict in Hanrahan's favor was a miscarriage of justice.  Counsel has provided only one example of an inconsistent statement – Hanrahan testified that he told Wilson

that Wilson was "full of s___" despite having testified at a deposition that he did not use profanity at work.

Apparently, Wilson would have preferred for the jury to apply the principle of *falsus in uno, falsus in omnibus* to the entirety of Hanrahan's testimony and then return a verdict in Wilson's favor. The jury declined to do so. This one purported instance of impeachment is not sufficient to disturb the jury's assessment of Hanrahan's credibility as compared to Wilson's.

Having reviewed the trial transcript, I think both of these witnesses had credibility problems. It was up to the juror to resolve those problems, and it did.

### C. Defense Counsel's Statements

A party "seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." Marcic v. Reinauer Transp. Companies, 397 F.3d 120, 124 (2d Cir. 2005) (internal quotation marks and alterations omitted). "In particular, where the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial." Id.

First, Wilson asserts that counsel's references to the video of Wilson playing basketball were improper. The Court sustained the objection of Wilson's counsel to the introduction of the video into evidence and prohibited defense counsel from displaying the video to the jury because the defense was unable to satisfactorily authenticate the video. However, the Court did not preclude defense counsel from otherwise referring to the video, as its existence was probative of Hanrahan's state of mind, i.e., his professed reason for firing Wilson.

To the extent Wilson's counsel is arguing that the Court should have precluded references to the video under Federal Rule of Evidence 403, the Court rejects this argument.

First of all, that objection was not raised at trial; the Rule 403 objection was to the video itself – which was sustained – not to any references to it. More importantly, because Hanrahan's reasons for terminating Wilson included the video of Wilson playing basketball, the existence of the video was highly probative of Hanrahan's state of mind. Not allowing Hanrahan to refer to it would have given the jury a completely distorted picture of Hanrahan's stated rationale for terminating Wilson.[3]

Even if allowing defense counsel to reference the video was an error, it did not affect Wilson's substantive rights. Because Wilson and his counsel repeatedly conceded at trial that he played basketball at work, the jury would have learned this regardless of the video.

Second, plaintiff's counsel also argues that a new trial is warranted because of defense counsel's references to Wilson hating his job and to the pictures of scantily clad women that Wilson posted at his slop sink area. However, these statements were all supported by the record at trial: Wilson testified that cleaning bathrooms and staircases was "the worst job" and Hanrahan testified that Wilson was instructed to remove the pictures of scantily clad women. Wilson fails to show that defense counsel's statements, which were consistent with trial testimony, were even inaccurate or improper, let alone sufficient to warrant a new trial.

Third, Wilson's counsel contends that defense counsel improperly referenced letters from custodian engineers Gerard Estelle and James Durack. As the Court had previously ruled, defense counsel could show these letters to Wilson to refresh his recollection as to whether Wilson received them – which is exactly what defense counsel did – and the jury would

---

[3] In fact, I was surprised at trial that Wilson's counsel objected to the introduction of the video, especially once I allowed Hanrahan to testify that he had seen it and it had informed his decision to terminate Wilson. The position of Wilson's counsel was that that the video did not show Wilson playing basketball, or at least Wilson could not be positively identified. If that was so, then the video would have impeached Hanrahan's testimony. But by successfully objecting to exclude the video, Wilson's counsel left the jury with the impression that it may well have confirmed Hanrahan's testimony. In any event, that was a strategic decision by Wilson's counsel that could not deprive Hanrahan of the ability to testify why he fired Wilson.

determine whether Wilson received the letters. Wilson has again not shown how any of defense counsel's references to these letters were improper, let alone grounds for a new trial.

### D. Adverse Employment Action and Hostile Work Environment

Under the law of the case doctrine, a "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." U.S. v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotation marks and citations omitted).

In the Court's summary judgment order, the Court ruled that Wilson suffered only one adverse employment action – his termination – and dismissed his hostile work environment claim. Wilson moved the Court to reconsider its hostile work environment claim, but the Court denied his motion for reconsideration.

In his motion for a new trial, Wilson's counsel seeks yet another bite at the apple by renewing the contention that Wilson suffered multiple adverse employment actions and also requesting – yet again – that the Court reconsider its dismissal of the hostile work environment claim. However, Wilson's counsel has not provided any reason for the Court to reconsider its pretrial ruling.

### E. Protected Activities

Wilson's counsel falsely claims that the Court erroneously excluded evidence of four complaints that he filed with various administrative bodies. However, the Court in fact allowed him to testify about all four of these complaints. The fact that the Court allowed Wilson to testify about these complaints, without distracting the jury through the self-serving statements contained in them, was proper and not prejudicial. See Isaac v. City of New York, 271 F. App'x 60 (2d Cir. 2008) (explaining that the admission of administrative complaints in a discrimination

action is within the court's discretion). The jury had to decide this case based on Wilson's testimony at trial about his experiences with Hanrahan; carefully crafted administrative complaints making Wilson's case before he even brought it were either hearsay, or had limited probative value that was substantially outweighed by their prejudicial impact.

### F. Jury Instructions

For obvious reasons, only in extraordinary cases can a party wait until after an adverse verdict before challenging jury instructions. When parties with "ample opportunity to raise their … objection to the jury instructions … cho[o]se not to take advantage of those opportunities …. such an objection is deemed waived. " Olsen v. County of Nassau, 615 F. Supp. 2d 35, 44 (E.D.N.Y. 2009). Under Federal Rule of Civil Procedure 51, if a party waives an objection to a jury instruction, a court reviews the instruction for "plain error … if the error affects substantial rights."[4] "[T]he plain error exception should only be invoked with extreme caution in the civil context" and "[o]nly where an unpreserved error is so serious and flagrant that it goes to the very integrity of the trial will a new civil trial be warranted." Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 18 (2d Cir. 1996) (internal quotation marks and alterations omitted).

The Court finds no error in the jury instructions, let alone an error that would warrant a new trial. Wilson's counsel claims that the jury instructions were erroneous because they did not instruct the jury that the employer may raise the affirmative defense that it would have made the same decision even in the absence of a discriminatory motive. See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274 (1977).

---

[4] The Second Circuit has also applied the "fundamental error" standard in reviewing unpreserved objections to jury instructions. Rasanen v. Doe, 723 F.3d 325, 332 n.2 (2d Cir. 2013). Here, the result would be the same under either the plain error or the fundamental error standard.

"[A] jury must be instructed, *if requested*, to apply the *Price Waterhouse* burden-shifting analysis *if* it finds the employer was motivated by discriminatory animus but is not fully persuaded by the plaintiff's claims of pretext." Rose v. New York City Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001) (emphasis added). But "a mixed-motive instruction is not given *unless* it is requested … ." Vasquez v. New York City Dept. of Educ., No. 11–CV–3674, 2015 WL 3619432, at *5 (S.D.N.Y. June 10, 2015). Since no party requested this instruction, the Court was not required to provide it. See id.

Wilson's argument to the contrary is backwards. His counsel declares that "[p]recedent in this Circuit has required Defendants to request a mixed motive jury instruction as an affirmative defense," but she provides no citation for this *ipse dixit*. To the contrary, the Second Circuit has explained that if "the plaintiff has carried the burden of persua[sion] … *the employer has the option of defending on the Price Waterhouse ground* … ." Ostrowski v. Atlantic Mut. Ins. Companies, 968 F.2d 171,181 (2d Cir. 1992) (emphasis added). The Court finds no basis to impose the obligation on either party to request a "same decision" instruction, especially where such an instruction would have been totally at odds with Hanrahan's defense strategy.

It is not up to a plaintiff in a discrimination case to tell a defendant which affirmative defenses it has to raise at trial. Hanrahan could have defended the action on the basis that even if he had a discriminatory motive, Wilson would have been fired anyway. If he had decided to raise that defense, then he would also have to decide whether to just argue it to the jury, or ask the Court to instruct the jury that his argument, if factually valid, was consistent with the law.

Hanrahan's counsel decided not to pursue that strategy. Rather, he decided Wilson's evidence of racial discrimination was so thin that the better argument was to deny that it played any role at all in Hanrahan's decision to fire Wilson. Wilson may not retroactively dictate

15

Hanrahan's defense strategy in a post-trial motion and then obtain a new trial because the jury instructions failed to reflect a potential defense argument that Hanrahan never made.

## II. Motion to Consolidate Defendants

"*Monell* claims are derivative of … claims against … individual defendants, and therefore any claims dismissed as against … individual defendants must also be dismissed as against the City." Pinter v. City of New York, 448 F. App'x 99, 106 (2d Cir. 2011). Thus, a trial on the Monell claim is unnecessary if the relevant individual defendants are found to be not liable, and avoiding the inefficiency associated with unnecessarily trying Monell claims is a "legitimate bas[i]s for bifurcating the proceedings." Amato v. City of Saratoga Springs, N.Y., 170 F.3d 311, 316 (2d Cir. 1999).

In its order granting in part and denying in part defendants' motion for summary judgment, the Court severed Wilson's Monell claim. Wilson moved the Court to reconsider its decision severing the Monell claim and the Court denied the motion for reconsideration. This decision to sever the Monell claim is therefore law of the case. Wilson's counsel claims that the decision to sever the Monell claim was erroneous.

Quite the contrary. The Court recognized that the seminal issue in this case was whether Hanrahan had illegally discriminated against Wilson. The Court exercised its discretion to try that issue first because if Wilson couldn't prove that, then of course any Monell claim would fail. See In re September 11 Litigation, 802 F.3d 314, 339 (2d Cir. 2015) ("Decisions to bifurcate trials … are typically well within the discretion of district courts.").

This is exactly what happened. Because the jury found no liability against Hanrahan, there could be no Monell claim, and the parties and the Court were spared the unnecessary burden of considering whether any discrimination by Hanrahan constituted a "policy or practice"

16

of the Department of Education or whether he was a "policy maker" that would render the DOE liable. Structuring the trial in an efficient manner is not grounds for a new trial.

## **CONCLUSION**

Wilson's [147] motion for a new trial and consolidation of defendants is denied.

**SO ORDERED.**

                                                                               U.S.D.J.

Dated: Brooklyn, New York
        March 27, 2019